UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GABRIEL JAMES OXFORD | ) | CHAPTER 7 |
| And | ) | |
| ANITA L. OXFORD | ) | |
|     DEBTORS | ) | CASE NO. 10-30963 |
| | ) | |
| _____ | ) | |
| | ) | |
| KENN BRANN, ET AL, PLAINTIFFS | ) | |
| | ) | |
| V. | ) | ADV. PROC. NO. 10-03033 |
| | ) | |
| GABRIEL OXFORD, ET AL. | ) | |
|     DEFENDANTS | ) | |

**MEMORANDUM OPINION**

This Adversary Proceeding presents the very worst in bankruptcy cases — profligate debtors with absolutely no intention of changing their ways, with just enough cunning to slide like eels through the bankruptcy system without tripping the trap of non-dischargeability . Here, unfortunately, is a small piece of their story.

On February 25, 2010, like clock-work, Gabriel James Oxford and Anita L. Oxford (the "Defendants") filed their third Chapter 7 petition. They had previously filed Chapter 7 petitions on November 16, 2001 and March 3, 1994, receiving discharges on February 13, 2002 and June 8, 1994, respectively.[1]  Indeed, the Court anticipates seeing the Defendants again some time in

---

[1] Based on the sworn oral testimony in this case regarding prior bankruptcy cases, the Court has taken judicial notice of the Defendants' other bankruptcy filings. *See, e.g, In re Saco Local Dev. Corp.*, 30 B.R. 863, 864–65 (Bankr. D. Me. 1983); *In re Missionary Baptist Found. Of America, Inc.*, 712 F.2d 206, 211 (5th Cir. 1983) (Court may take judicial notice of the record in prior related proceedings); *cf.* FED. R. EVID. 201, made applicable by virtue of FED. R. BANKR. P. 9017.

2018.[2]  On November 1, 2010, Gordon Rowe, the Chapter 7 Trustee assigned to this case, reported no distribution.  The Defendants discharged almost $400,000 in their latest bankruptcy and, pending this Adversary Proceedings, are seeking to discharge another $165,000.

On April 28, 2010, Kenn Brann and Debbi Brann (the "Plaintiffs") filed this Adversary Proceeding against the Defendants.  The Plaintiffs allege that the debt, approximately $165,215.29, owed by the Defendants to the Plaintiffs is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6).  This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a).  This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(I).  This matter came before the Court for trial on October 4, 2010. The Court considered the written submissions of the parties, the documentary evidence, the testimony presented at trial and the arguments of counsel for the parties. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## FINDINGS OF FACT

Debbi Brann met Anita Oxford at New Horizons Full Gospel Church sometime in 2003 or 2004.  The Defendants had been members at the church for approximately ten years and had held leadership positions.  One such task was greeting visitors.  Debbi Brann met Gabriel Oxford shortly thereafter, and the families quickly developed a close relationship.  The Defendants appear to have encouraged their two daughters to begin calling Debbi "Grandma," and Debbi did not discourage this behavior.  While it is unclear whether Gabriel ever actually

---

[2]Whether such appearance will be in their present guise of the "Oxfords" remains to be seen.  The Court notes that the Defendants appeared in their first Chapter 7 bankruptcy as "Harry L. Nurse, III and Anita L. Nurse."  Presumably, the Defendants had legally changed their names prior to the subsequent bankruptcies.

called Debbi "Mom," it is clear that he treated her as a mother-figure and let her believe that they had such a relationship. The pervasiveness of this relationship is clear from the fact that within two years of meeting the Defendants, Debbi began to make loans to them. Debbi made a loan of $25,000 to the Defendants in June 2005; a second loan of $6,000 in December 2005; a third loan of $89,000 in January 2006; and the fourth and final loan of $40,000 in March 2006. These funds all came from a line of credit secured by the equity in the Plaintiffs' home. Sometime prior to the third loan, Gabriel was aware that the money was coming from the line of credit. While testimony indicated that Debbi discussed these loans with her husband, Kenn, it is clear that Debbi drove the decision for the Plaintiffs to disburse these funds to the Defendants.

In 2005, the Defendants worked for RE/MAX as real estate agents. During that time, the Defendants and the Plaintiffs discussed the possibility of Kenn taking his real estate license out of escrow and working for the Defendants with Gabriel being the broker. To do this, the Defendants wanted to renovate the basement in their home to establish a home office. The Defendants would then open their own real estate firm, and Kenn would work in that office. It was unclear whether Kenn was to be an employee of the Defendants' new company or would have a more typical agent relationship and be given the opportunity to sell homes under the banner of the new company. The Defendants did renovate their basement, presumably with funds from the $25,000 loan from the Plaintiffs. They did form a new company, Unison Real Estate, Inc., on July 13, 2005.[3] The Defendants, however, did not immediately operate the new company. Instead, Kenn came to work for RE/MAX with the Defendants. This continued through early 2006. In December 2005, the Plaintiffs attended a Christmas party at RE/MAX

---

[3] The Secretary of State administratively dissolved this corporation on November 2, 2006, for failure to file its 2006 annual report within sixty days after it was due.

where Debbi began to feel like a part of that company.  At about that time, the Defendants made their second loan request from Debbi.  The Defendants needed this loan due to financial troubles that they were having, and Debbi made this loan for the Defendants' personal expenses.[4]

In January 2006, Gabriel again came back to the well to see if he could get more funds from Debbi.  The two discussed the possibility of refinancing the Defendants' debt so that there would only be one monthly payment.  Gabriel provided a list of items that he wanted to consolidate, that included two car loans, student loans, taxes, a home equity line secured by a second mortgage, and medical bills.  This amounted to another $70,000 in debt.  Based on these discussions, Debbi agreed to lend Gabriel $89,000.

Plaintiffs allege that these funds did not go for the agreed purposes.  The evidence, however, indicated that the Defendants did at least use the funds to bring the home equity line of credit current — for one day.  Unfortunately, the Defendants immediately began to make draws on their equity line after it was paid in full.  While this may not have been a reasonable, intelligent decision, the Defendants appear to have used the money for the agreed purpose stated to the Plaintiffs.  Based on the listing of their cars with no secured debt in the petition, the Defendants apparently used the funds to pay off their car loans.  Although, the schedules list $8,451 in student loan debt, which is greater than the $6,693.13 discussed by the parties in 2006, Gabriel testified to the fact that he incurred more student loan debt after 2006.  Gabriel also testified , credibly, that they incurred new medical bills following the 2006 loan.  While the

---

[4]Debbi suggested that the Defendants had improperly used these funds because the $6,000 check was deposited in their business account.  Unfortunately, as is clear from the state of the Defendants' finances and the informality with which they treat the corporate form, the fact that money was deposited into a business account does not mean that it did not go to personal expenses.  As the $6,000 loan was for personal expenses, there is no evidence that would suggest that this money was used for improper purposes.

Defendants' schedules list $7,300 in tax obligations, this is lower than the $17,164 agreed between the parties, so it appears that payments were also made on the taxes.

There was a final loan of $40,000 made by the Plaintiffs to the Defendants in March 2006. This loan was to cover taxes which Gabriel discovered after the loan in January. While a cash infusion of $160,000 would be able to right most ships, it did not seem to have that salutary effect for the Defendants. Granted, it did stave off the necessity of filing bankruptcy for four years.

Finally, the Plaintiffs submitted the testimony of a former business partner of Gabriel in an apparent attempt to show Defendants' fraudulent "nature." Ken Meyer testified credibly of his experience with Gabriel Oxford in the 1990's. Meyer knew Gabriel at the time as Trey Nurse, and the two partnered in a development business. The deal involved the purchase of Trey Nurse's father's business. While the partnership lasted for a couple of years, it fell victim to Gabriel's excessive spending on the "latest gadgets, bells and whistles." Mr. Meyer claimed that the failure of this partnership cost him approximately $800,000, but this was more of an accounting loss rather than actual funds. Mr. Meyer did not seek to have his debt determined nondischargeable in the Defendants' 2001 filing. While this testimony corroborated that Gabriel Oxford has an inability to manage funds, it did not corroborate an intent to defraud the Plaintiffs.

## CONCLUSIONS OF LAW

The Plaintiffs have alleged that the debt is not dischargeable because it was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). To except a debt from

discharge under 11 U.S.C. § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representations; and (4) the creditor's reliance was the proximate cause of the loss. *Rembert v. AT&T Univ's Card Svcs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998). The plaintiff need only show that the property was obtained either by false representation, false pretense or actual fraud, not a showing of all three. *In re Rapp*, 375 B.R. 421 (Bankr. S.D. Ohio 2007). The objecting creditor bears the burden of proof by a preponderance of the evidence to establish the debt is of a type excepted from discharge. *In re Molino*, 225 B.R. 904, 907 (6th Cir. BAP 1998). Exceptions to the discharge of a debt are to be strictly construed against he creditor and liberally in favor fo the debtor. *Gleason v. Thaw*, 236 U.S. 558, 561-62 (1915). The inquiry into the requisite fraudulent intent to warrant an exception to discharge under 11 U.S.C. § 523(a)(2)(A) is subjective. *Field v. Mans*, 516 U.S. 59, 70-72 (1995). The requisite fraudulent intent may be established through either direct or circumstantial evidence. *In re Horton*, 372 B.R. 349 (Bankr. W.D. Ky. 2007). Silence can create a false impression which would be actionable under § 523(a)(2)(A), *Demarest v. Rainier Title Co. (In re Demarest)*, 176 B.R. 917, 920 (Bankr. W.D. Wash. 1995), but the creditor must still show reliance, materiality, and intent.

  In the case *sub judice*, the Plaintiffs allege that the Defendants misrepresented the purposes for which the loans would be used, failed to disclose Debtors' past bankruptcy filing, failed to disclose Debtors' financial condition. Section 523(a)(2)(A) applies only to statements not respecting the financial condition of a debtor. Subsection (B) applies to statements regarding

financial conditions but requires that those statements be in writing. The Plaintiffs provided no evidence showing a writing that misrepresented the financial condition of the Defendants and as such, this allegation remains unproven. In fact, when the Defendants sought the second loan of $6,000, the Plaintiffs were aware that the Defendants were having financial difficulty and thus knew this for the subsequent loans.

As discussed above, the Defendants appear to have used the December 2005, January 2006, and March 2006 for their stated purposes. This leaves only the $25,000 loan of June 2005 for the Court to consider. The purpose for the $25,000 loan was to renovate the basement of the Defendants' home so it could be used as a home office. This home office would be used for the planned real estate company which the Defendants would operate and in which Kenn Brann would have some unspecified role. The Defendants did incorporate a business shortly after the loan, but there was no evidence that they ever operated a business from that basement office with Kenn Brann. The statement of intent to perform an act in the future will not generally establish a false representation. *In re Bucciarelli*, 429 B.R. 372 (Bankr. N.D. Ga. 2010). For a future intention to be fraudulent, the creditor must establish that the debtor lacked the subjective intent at the time the statement was made. *Id.* The Defendants seemed to have every intent of working with Kenn in the real estate market. Just because the Defendants did not live up to their promise, does not mean that they intended to defraud the Plaintiffs. The Plaintiffs may have relied on this promise to start a business and that it was a material promise supporting the basis for the loan, but even though it never came about, it was not an actionable fraudulent promise.

There was no evidence showing that the Defendants intended to defraud the Plaintiffs when they allegedly failed to disclose their prior bankruptcies. The evidence also suggested that

the Plaintiffs may have been aware of the previous bankruptcies. The Plaintiffs were aware that the best interest rate available to the Defendants for a refinancing was approximately twelve percent, a figure highly-indicative of credit difficulties. When making a loan of $160,000 with no security, it is not reasonable to rely solely on the statements of the debtor. Whether the failure to disclose the bankruptcy was material or not and whether the Plaintiffs' reliance was reasonable or not, the lack of demonstrated intent by the Defendants means that it is not sufficient to exclude this debt from discharge.

The Plaintiffs have also alleged that this debt is not dischargeable due to it being a willful and malicious injury by the debtor to another entity or such entity's property. Section 523(a)(6) only excludes from discharge those injuries which are both willful and malicious. A "willful" injury is a "deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original). The Supreme Court requires that the debtor actually intend the injury caused, not merely intend the act that causes the injury. *See Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576, 580 (6th Cir. 2001). The Sixth Circuit requires "that unless 'the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999). There has been no intentional act, let alone an intentional injury, proven by the Plaintiffs to support a cause of action under § 523(a)(6).

## CONCLUSION

The Defendants clearly have engaged in morally questionable conduct. Unfortunately for the Plaintiffs, morally questionable conduct is not all that is required for a debt to be determined

to be nondischargeable under the Bankruptcy Code. There was no tortious act which has caused the injury to the Plaintiffs. All the Defendants have done in this situation is breach their promise to repay the funds. Their promise to start operating a new business is insufficient to support a cause of action for misrepresentation. In a contract, the parties always have the right to breach that promise and this does not result in a tortious injury. All that is left to the wronged party is a cause of action for breach, which, in this situation, is fully dischargeable.

The Defendants have met the requirements for a discharge and will receive it in this case. Before giving them their pass, however, the Court will say a few last words about the Defendants' reprehensible conduct. They allowed their children to use manipulative language which created a familial relationship with Debbi. They enticed the Plaintiffs with promises of a new opportunity for Kenn which would not involve travel. These, among many other factors, led the Plaintiffs to loan over $160,000 to the Defendants. The Plaintiffs did not have these funds available but instead used a line of credit secured by their home. The Defendants made much of the fact that they signed a note evidencing the loan post-disbursement, presumably for the purpose of giving the Plaintiffs a sense of security. But the Defendants' experience with bankruptcy made this a false sense of security. Since this documentation was generated after the loans were already made, it cannot be the basis for a false representation claim since there could be no reliance on it. If Gabriel ever truly views his relationship with Debbi as mother-son, the Defendants would reaffirm their debt to Plaintiffs. Time will tell in that regard. Unfortunately, since this debt does not fall within an exception to discharge, this Court cannot force Gabriel to reaffirm the debt to the Plaintiffs.

For the foregoing reasons, this Court finds that the debts arising from the monies loaned

by the Branns to the Oxfords are dischargeable. This Court will enter a separate Order consistent with this Memorandum Opinion.